Thank you. May it please the Court, I'm William Kopeny for the appellant, Daisy Burlingame. I just have a question. I got an amended calendar saying that I have ten minutes. Right. But the timer says 20. I just wanted to clarify. I think this is incorrect, because we – because you had a co-defendant – yeah, there was another related case, right, where the appeal was dismissed. Thank you. So I should assume it's ten. Yes. Thank you. Your Honors, the opening brief raised five issues in this case. In the reply brief, we conceded one of the issues, and in the response brief, in the appellee's brief, the government conceded one of the issues. So there are now three issues that are being disputed before the Court. Those issues are whether or not the good faith instruction that was given under the circumstances of this case was plain error, whether or not the government violated due process and deprived the defendant of a fair trial by vouching for its most important fact witness, and whether or not the trial court committed plain error by the way it handled the government's expert witness in conjunction with what the appellant concedes is at the very best terrible advocacy on the part of her counsel in cross-examining that expert. I intend to address in some detail in the time I have the first two issues, and if the Court has questions about the third, I'll be happy to address them. I tried to treat that in as much detail in my briefs, but I don't mean to be avoiding that issue. You're not foreclosing any arguments by not discussing them orally. Thank you very much, Your Honor. There are some circumstances about the good – the giving of the good faith instruction in this case that I think are very unusual. And those circumstances include this instruction was requested by the government. And I don't know how many appeals this panel has heard where the defense is complaining that they didn't get a good faith instruction, but the government almost always objects to it and says that under case law that we can all cite from this Court that it's not necessary so long as the jury is properly instructed on the intent to defraud in this kind of a case. But the government in this case did not request the Ninth Circuit model instruction on good faith. Instead, the government found an instruction which has been approved only in the Fifth Circuit, I believe, and I cited that to the 11th Circuit model instruction. And that instruction had been held to be plain error in the Rosamondo case, where I believe the circumstances are analogous, if not identical, to this case. The government distinguishes or attempts to distinguish the Rosamondo facts from our facts by saying that in that case the firefighter who was overstating a fact in making a bank loan claimed that he had done so by mistake. In other words, was arguing negligence rather than intentional lying. But in both of these cases, there – and the government says this. I thought this was something that the Court should look at, because I think this is important to address the question. The defendant in Rosamondo claimed that he did not believe the pensions fund's interests would be harmed either in the short run or the long run. And I'm using those – that phrase from the government in order to try to bracket what I think the distinction between the parties' arguments are here about this good faith instruction. The government seems to be saying that here the defense was that, well, we're going to commit fraud, but we think that ultimately you'll be paid back. And that's clearly not the only possible defense version of – interpretation of the evidence that the jury could have drawn. If the jury believed that Mr. Parker had – had fooled the appellant, Daisy Burlingame here, into believing that he really had all that collateral, that $22 million and the power of attorney and all of – all that – all those yen, which he testified he didn't really have, but he had all this – all these artifacts to fool people about. If the jury believed that Burlingame believed that, there would be no intent to defraud in the short run or the long run. But the government – and you can see this from the entire way the government handled this case. In their opening statement, the government, I believe, discloses its concern that the jury might think Daisy Burlingame believed in this scheme. She thought it was really supported by the collateral and the people would get loans because she believed Parker. So what they told the jury was, you know, this case is all – is all about lies. And Daisy Burlingame told a lot of lies. And we can see in our brief, and I will read the concession here, that there is evidence from which the jury could have believed that Daisy Burlingame lied to the victims of this fraud. But this instruction allows the jury to reject the good faith defense if the jury finds that she told lies with the intent to deceive. It does not require them to find that she told those lies with the intent to defraud. And there are two elements. One is a false statement. And I submit that virtually any intentional false statement is made with the intent to deceive. But that doesn't really address whether or not the good faith defense is still available on the absence of an intent to defraud. And I submit that although we aren't saying that it's impossible for the jury to have gotten to the conclusion that Burlingame knew, as Parker testified, knew there was no collateral, on this record, it certainly is a possibility that the jury believed she thought there was collateral. She didn't think she was defrauding people into parting with their advance fee in order to get a loan that was never going to be given, but that she told other lies. And, of course, she didn't testify. So she never denied either having the intent to defraud, nor did she ever explain those lies. But it seems to me that the Rosamondo holding is that the jury is given a good faith instruction and told that it doesn't matter whether the defendant had the intent to defraud. If they told any lies with the intent to deceive, that is the equivalent of an intent to defraud, or that removes the good faith defense. But that's misleading, and it prevented a jury who may have believed Burlingame had no intent to defraud from acquitting under that instruction. And I can only believe that the reason the government took the extraordinary step of asking for a good faith instruction that was worded exactly this way from an out-of-circuit model instruction was because the government realized that what they really couldn't prove convincingly was that Burlingame knew that this was a fraudulent scheme from the beginning to the end. All they could really prove was that she told a lot of lies along the way. And really, the only evidence they had about that was two. It was Parker saying, well, I told her originally that we had the collateral, but later I told her the truth, that we didn't have the collateral. It isn't clear to me that the jury must have accepted as whole cloth the guarantee of the prosecutor or for any other reason that everything Parker said was true. After all, he was the one that was admitting that he had conceived this scheme to defraud people of millions of dollars and that he had been telling lies convincingly for a long time. In fact, he even conceived the scheme of how to confirm that his lies were true by having another co-defendant as a shill former borrower who would confirm that he had gotten his loan and that he, in fact, had seen the program work. So I think it's possible on this record. I think it's a good possibility that a jury would have had some doubt about what Parker said. The only other evidence about whether Burlingame knew this was a fraudulent scheme, as opposed to the substantial evidence that Burlingame told lies, was that the expert said, if you're involved in this, you know it's a fraud. And, you know, that really gets to the other issue, and that is the question of whether or not the government committed vouching that was reversible error. I submit that there's no question the government vouched for Parker. The question really is the plan here. Yeah. I think that's a difficult question here, but I think the Court should look at a couple of things. One, every almost everything that the prosecutor did that we are characterizing in this appeal as vouching was objected to by the defense attorney. Now, it wasn't objected to as vouching, and it wasn't objected to as depriving her client of a fair trial, but she objected that, Your Honor, I'm way over my time, and I don't unless it's been revised when I wasn't looking, I don't want to I don't want to infringe on your time. I'm sorry. It's the warning light. Oh, I'm sorry. She objected when the prosecutor told the jury that he could guarantee that Parker was telling the truth, and she objected because it was argument, not an opening statement. Admittedly, our view would be that Judge Carter would have known that that was improper vouching to make that guarantee, and that the objection would have focused his attention on what the prosecutor was saying, notwithstanding that it didn't say vouching. And in addition, she objected to the plea agreement coming in at all. Now, the judge said, why don't you want the factual basis in there, for what may be obvious reasons, because that's a problem when the factual basis is there, and it's kind of like testimony that the government is confirming about, you know, how the witness was a participant in a crime. But the defense lawyer said, no, I'm objecting to the plea agreement altogether. Now, the combination of those two things in this case, I think, clearly shows that it was vouching, but it also was, in his closing argument, which I quoted in my reply brief, I believe, yeah, the prosecutor told the jury that the key provision in that agreement is he had to tell the truth, and then goes on to say, and if he gets – if someone catches him lying, he's not going to get his deal. And the prosecutor didn't say, if someone catches him perjury himself in this trial, or if someone catches him lying based on the evidence that has been presented to you folks in the jury, the prosecutor says, in fact, he told the jury, this same judge is going to sentence Mr. Parker, and if he got caught lying, he isn't going to get his deal. Now, any reasonable juror could, and I submit would under these circumstances, conclude that that means the prosecutor was testing his trial testimony against Berlinghame, not just by the evidence that they had heard, but by all the information that the prosecutor's office had. And the reasonable inference would be that this prosecutor was saying, he didn't lie to you folks, and I'm going to have to stand up and make that argument to this judge. So I wouldn't be able to tell you, if I caught him lying, either for things you've heard or for things I know, he's not going to get his deal. This prosecutor was clearly implying, and I think under the cases that we cited, the Weatherspoon case, I think it was clearly implying that he knew that Parker was telling the truth, not just because of what the jury had heard, but because of the terms of the deal, which required the prosecutor to determine whether he was lying before he would be sentenced. All right. Now you are over, Counsel. Thank you very much. Good morning. May it please the Court. Elizabeth Olsen on behalf of the United States. I'll start with the improper vouching claim. And I'd like to start with just an observation about improper vouching and why it matters. You know, what is it that we're concerned about with improper vouching? And what we're concerned about is that the jury will just take the prosecutor's word for it, rather than making their own assessment about the credibility of the witnesses or the strength of the evidence. And that they'll do that either because it's the government, and we just believe what the government tells us, or because the prosecutor must know something that we don't know. And that's what we're afraid that the jury is going to do. And I think that if you look at the prosecutor's opening statement, the challenged opening statement, in that context, what you see is that not only was this not improper vouching, it was very nearly the opposite of improper vouching, because the prosecutor was not saying, sit back, relax on this point, you don't have to worry about this, you just take my word for it. And he wasn't saying, listen, you've only – what you're going to hear is only part of the story. If you knew what I know, you'd find Mr. Parker credible. He, in fact, said the exact opposite. He said, we're going to put Mr. Parker on the stand, and you might have some doubts about his credibility, as well you should, because he's the one who came up with this whole scheme. I mean, he's not an honest person. But it's your job to test his credibility. It's your job to make that determination. And the way that you do that is you compare what he says to what all of the other witnesses say. You compare the evidence that he gives with all of the other evidence before you, and only on the basis – solely on the basis of the evidence before you, when you do your job of assessing his credibility, you're going to find that on the key points, what he says matches what other people say. Now, yes, the prosecutor used – he didn't just say, you will find. He said, I guarantee you will find. In the context of that statement, I would say that the use of that phrase, I guarantee, it was a predictive. It was a rhetorical predictive. Here's what the evidence is going to show. I mean, this is what opening statements are. Each side gets to make – gets to lay out the story. Here's what the evidence is going to show. And you can hold me to it. I mean, at the end of the day, if the evidence doesn't show this, well, then you have to – you have to acquit the defendant. So, yes, I mean, I think in retrospect, and the trial attorney, I'm sure, would agree that in retrospect, it would have been better if he'd used a different word, only because then the issue wouldn't be here at all, because that's – it's only because he used the – he used the two words, I guarantee, that this is even an issue. Because if you take that out and just look at what he was saying, he wasn't vouching at all. I suppose – I disagree with you. I think this is vouching. Because you said, I can guarantee, but the real question on this is whether the objections that were made by defense counsel preserves the vouching – the vouching argument on appeal, so whether we do harmless error or plain error review. There was no vouching objection here. In the – He did object, but it was on a different ground. Yes. She made an objection saying that the prosecutor was arguing. It was an objection argument. And the trial judge told the prosecutor to go on, but she never made any sort of objection about this or about the plea agreement. And of course, the law in the circuit is clear about the plea agreement, that it's okay for prosecutors to address the truth provision of a plea agreement in response to attacks on the witness's credibility by the defendant based on the plea agreement. And that's what happened in this case. Of course, the prosecutor didn't mention the plea agreement at all until defense counsel was – fairly sustained attack on cross-examination. Wait a second. You've got this plea deal. Doesn't that mean you're going to tell – you're going to say whatever the government wants you to say? And only after that cross-examination on redirect did the prosecutor elicit from Mr. Parker his understanding that under the terms of his plea agreement, he is obligated to tell the truth. Just going back to the – to the opening statement, though, I think – I really do believe that there's a difference between saying, I guarantee that this person is credible, I, take my word for it, I guarantee he's credible, and saying, I guarantee that at the end of the day, you're going to find, when you weigh the evidence, when you look at what he says and you compare it with everything else in front of you, you're going to find that he's credible. And if you look at the things that we're concerned about, I mean, the two concerns of improper vouching are that the government – that the jury is not going to make its own assessment, and here you've got the prosecutor saying to the jury, you need to make your own assessment, and that the prosecutor is going to suggest that there's evidence outside the record, and the prosecutor here was saying just based on, you know, what he says matches what the other witnesses say. If you have any other questions on vouching or I'll talk just briefly about the good faith instruction, I think the first thing I'd point out about the good faith instruction is that even within the instruction itself, it does make very clear, and it's reprinted on page 14 of our brief, that the government must establish beyond a reasonable doubt that the defendant acted with the specific intent to defraud as charged in the indictment. That was said within the context of this good faith instruction itself. It was also said at least five other times in the jury instructions, and that's a little bit later on in our brief. The good faith defense. I think there might be just sort of a misunderstanding about the scope of the good faith instruction. I mean, you can't be intending to defraud someone if you actually believe what you're saying. But that just because you believe that in the end everything's going to work out okay, that doesn't make it okay to lie to somebody with a specific intent to get them to turn over money that they would not have given had you told them the truth. And so if you look specifically at the lies and misrepresentations that Ms. Burlingame was making, I mean, she was saying this works. I've seen it work. This loan thing that we've got going here, I've made $30 million in commissions on finished loans. I don't get any — I don't get a penny until your loan is funded, and I've made $30 million on funded loans. She said that I don't get any money until you — until your loan is funded. She says we've been in business for 35 years. She says we're funding — she told one client, one victim, we are right now funding loans at the rate of $3 billion a month. Now, these are things that she had to know were not true. I mean, it was certainly about her commissions. I mean, certainly when she told these defendants that her own projects had been funded. Well, the way that she told the victims the payment system works, she got a percentage of the actual loan. You know, once the payment system works, she's telling these victims that she has had these projects funded. I mean, that is just an out-and-out lie, because she knows that none of her victims have been funded. First of all, because they're calling her every day on the telephone saying, where is my money? And she's making up lies. You know, she is, in some cases, making up lies herself. In many other cases, relaying lies from Mr. Parker about, oh, it's just going to be another week. It's just going to be another month. You know, she got half a million dollars off of her share of the retainer that was being paid by these victims on the basis of the lies that she was telling. I'm just curious. What was Parker's sentence? Did he get downward departure for substantial assistance? You know, I want to say, you know what, I think I shouldn't say. I'm not sure about that. I think he got a downward – I think that he got a downward departure. He got 57 months. Fifty-seven months. He was 80 years old. And so I think that there were some health – I mean, there were some downward – there might have been a downward adjustment based on health issues as well. So, and, yes, and I mean, we did concede on the fifth point of our argument. We did concede to the Ameline remand, because the district sentences that all the other people got, I think something more along the lines of, I think he said 47 to 56 months would be – Seven or something. Yeah. No, he thought it would be much less if he hadn't been bound by the guidelines. Well, I mean, she got 63 months, so it wouldn't have been a whole lot less. I mean, it sounded to me like it could have gone down as much as from 63 to 45. So I don't think a limited remand is actually appropriate in this case, because we don't have the, like, unanswered question from, I guess, the en banc. Oh, yeah. No, no, no. I'm sorry. I didn't mean Ameline remand. I meant Booker remand. No, it'll be vacating for resentencing. Yes, absolutely. Because he has – he was clear enough in denying her – I think it was when he denied her motion for bail pending appeal. He was clear enough that if he had had the discretion, he would have liked to go down to somewhere in the 45 to 50 range. And so we have conceded for that remand. Yeah, the other worker that pled got 43 months. Yes. Was that Mr. Feldman? Yeah. Yeah. So I think – I mean, I think – and, you know, there were a lot of different factors. She was with the company for five years. I believe it was five years. One to four years. I'm sorry? One to four years. One to four years? She was there – Oh, I'm sorry. She was telling people she was there for five years. Yes. She was there for one to four years. She made a total of $125 billion in loan commitments. She – you know, she – I'm sorry. That's not – It's okay. Your time's up, and it's not really that relevant. Okay. Okay. It's quite since you did contribution. Thank you very much, counsel. Thank you.
judges: Hug, Wardlaw, Singleton